UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORDAN HOLLEY,<br><br>Defendant. | Case No. 25-cr-292 |

### GOVERNMENT'S SURREPLY TO THE DEFENDANT'S REPLY IN SUPPORT OF MOTION TO REINSTATE RELEASE ORDER

The United States of America, by and through its undersigned counsel, respectfully submits this surreply to the defendant's Reply in Support of Motion to Reinstate Release Order. For brevity, the government will not recite its previous statement of facts and procedural background.

## ARGUMENT

### I. The Cases Cited by the Defendant are Distinguishable.

In his brief, the defendant argues that his case is comparable to others in which defendants have been released while facing child exploitation charges. Namely, the defendant cites *United States v. Willis*, 22-mj-122 (BAH), *United States v. Donnell Taylor*, 22-cr-215 (BAH), and *United States v. Monsoor Ali*, 24-cr-43 (LLA). These cases are not analogous to Mr. Holley's present case.[1]

With respect to *Taylor* and *Ali*, the decision to release each of these defendants pending trial was predicated upon the defendants' unique underlying health issues. The circumstances present in each of these cases are not present here. Further, the facts of both cases are clearly distinguishable from Mr. Holley's case.

---

[1] The defendant also cites to *United States v. Dalonte Harrison*, 25-cr-187 (EGS). However, that case involved gun charges rather than child exploitation charges. It is more helpful for this Court to examine comparable charges rather than a firearms case.

In *Taylor*, the defendant suffered from an intellectual disability. At the time of his arrest, he lived at a D.C. Department of Disability Services residential care facility. The defendant had "a history of neurodevelopmental problems, and his intellectual quotient (IQ) scores have consistently measured significantly below average." ECF 58 at 1. Part of the Court's release order required the defendant to maintain his residence at the care facility and continue his care and treatment from DDS. Although DDS did not take third-party custody of the defendant, DDS was monitoring the defendant. Part of the release order specified that, "[i]f Defendant evades his staff, after five minutes, he will be subject to a 'Missing Person' protocol in which his staff will call for a D.C. Metropolitan Police Department Officer or D.C. Metropolitan Police Department Crisis Intervention Officer to facilitate a safe return home or transport of Defendant to an emergency psychiatric facility if he requires support for a mental health crisis;" and "[i]f Defendant evades his staff at all, regardless of the length of time, an incident report will be filed." This sort of supervision, by trained, independent individuals, is a far cry from home monitoring by a parent.

Though initially arrested for charges including Attempted Sexual Exploitation of a Child, in violation of 18 U.S.C. §§ 2251(a),(e), and Coercion and Enticement, in violation of 18 U.S.C. § 2422(b), the defendant ultimately pled guilty to Possession of Child Pornography, in violation of in violation of 18 U.S.C. § 2252(a)(4). Notably, in this case, the government asked for only time served. *See* ECF 59. The government stated in its sentencing memorandum:

> The defendant's communications with these minors do not exhibit the underlying predatory and exploitative intent that marks the overwhelming majority of child exploitation cases. The defendant's intellectual disability, discussed further below, is evident throughout his communications. He consistently appears to view, and relate to, the minors as their peer. A substantial percentage of his messages – which, in the case of MV2, span years – are not sexual in nature and discuss video games, anime, and similar topics. In sum, the defendant's offense is extremely serious and his actions unquestionably harmed two vulnerable children. At the same time, all the evidence available to the government shows that he did not have the malicious, predatory intent that is the hallmark of these crimes.

ECF 59 at 6. This situation is quite different from Mr. Holley's case, where he had clear intent to

2

sexually abuse a child and record the abuse in the present case and where he has expressed previous interest in sexually abusing children.

Likewise, *Ali* is completely different. In that case, the defendant was diagnosed with Stage IV cancer and was receiving radiation treatment five times per week at the time of his arrest. *See* ECF 8. In *Ali*, the defendant was charged with only Possession of Child Pornography, and the underlying conduct occurred approximately one and a half years prior to his arrest. The defendant's serious and unique medical condition, combined with the charges in that case, are completely distinguishable from Mr. Holley's present case.

The facts in *Willis* are also distinguishable. In *Willis*, the defendant sent messages to a 14-year-old girl seeking child sexual abuse material. The defendant sent the girl money in exchange for the photographs and sent a video of himself masturbating. The defendant also expressed interest in having sex with the child. But that defendant did not take additional affirmative steps to meet up with the girl. Unlike Mr. Holley, who traveled to Washington, D.C. for the express purposes of sexually abusing a child, Mr. Willis's conduct was limited to online behavior. This is not meant to diminish the severity of the conduct in *Willis*—however, that case involved a distinct fact pattern that did not involve travel.

**II.     The Defendant's Messages Show that His Sexual Interest in Children Goes Beyond Mere Fantasy.**

The defendant next argues that his other text messages in which he described explicit sexual abuse of children are just "fantasy." Reply at 14. The defendant refers to other categories of explicit messages he exchanged with users, including interests such as cuckholding and race play. While it is true that some of these messages appear to engage in sexual fantasy, Mr. Holley's interest in the sexual abuse of children goes beyond mere fantasy. For example, when S-1 clarified that her discussion of sexually abusing a child was "strictly fantasy" and "strictly talk," Mr. Holley

responded, "ima make fantasies that you have that you want to come true, I will make come true. No matter what it is . . . The ones that are talk, will be talk of course. But the ones you want for real, it will happen. I wont say no."

Likewise, the defendant sent *repeated* voice memos to S-6 in which he wanted to know S-6's address so he could have sex with his wife and children.  The defendant also expressed intent to meet up with S-7, a teenager.  He repeatedly asked S-7 when her parents were not home so he could come over and have sex with her.

The defendant showed in his messages that he was willing to make others' "fantasies" a reality.  When speaking to S-5, S-5 discussed her anger with a friend and asked the defendant to threaten to rape her friend.  The defendant did, in fact, send the threats, as well as continued harassment of the friend.  The defendant sent S-5 multiple screenshots to prove that he did what she asked.

The defendant also minimizes his conduct in his discussions with S-6, arguing that S-6 "instigated the talk of Mr. Holley having sex with his children."  The defendant again argues that this was mere fantasy.  This argument ignores the fact that S-6 sent photographs of actual children to Mr. Holley, as well as a photograph of a vagina that S-6 claimed was his daughter's.  Regardless of who initiated the conversation, Mr. Holley continued and escalated the conversation.  If this was mere fantasy, Mr. Holley could have ended the conversation after he received the photograph of what was purported to be a child's vagina.  He did not.  Mr. Holley continued to discuss his graphic sexual interest in the children, and as noted above, Mr. Holley repeatedly asked S-6 for his address so he could go to S-6's home.

Even if this Court accepts the defendant's argument that his other text messages were mere fantasy, the conversation he had with the UC and his subsequent actions were reality.  The defendant discussed abusing a child and then traveled into Washington, DC with that intent,

bringing with him lubricant, condoms, and a mask to wear while filming the abuse. Even assuming that the prior years of messages are just fantasy, the defendant poses an unmitigable danger to the community based on his violent escalation into reality. This Court should be deeply concerned by the defendant's long-standing sexual interest in children combined with his affirmative action of attempting to meet up with a child to sexually abuse her.

## CONCLUSION

For the reasons outlined above, as well as the reasons in the government's initial Opposition and Supplement, there are no conditions that can reasonably assure the safety of the community. This Court should uphold the Chief Judge's decision and keep Mr. Holley detained during the pendency of this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

Dated: October 22, 2025         By:   */s/ Rachel Bohlen*
                                       Rachel Bohlen
                                       D.C. Bar No. 1010981
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       for the District of Columbia
                                       601 D Street NW
                                       Washington, DC 20530
                                       (202) 809-3575
                                       rachel.bohlen@usdoj.gov