**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | Crim. No. 25-292 (EGS) |
| JORDAN HOLLEY | |
| Defendant. | |

<u>**MEMORANDUM OPINION**</u>

Pending before the Court is Defendant Jordan Holley's Motion for Bond Review ("Motion"). *See* Mot., ECF No. 33.[1] Mr. Holley requests that the Court review his bond status and release him to the High Intensity Supervision Program ("HISP") with the same conditions that were put in place by Magistrate Judge Sharbaugh on September 15, 2025.

Upon careful consideration of the parties' submissions, and because in view of the totality of the circumstances, Mr. Holley has failed to produce credible evidence to overcome the presumption that "no condition or combination of conditions will reasonably assure . . . the safety of the community" pursuant to

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

18 U.S.C. § 3142(e)(3)(E), the Court **DENIES** Mr. Holley's motion and orders Mr. Holley detained pending trial.

## I.    Background

### A. Procedural

Mr. Holley is charged with one count of Travel With Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b). At his arraignment on September 15, 2025, Magistrate Judge Sharbaugh released him to HISP into the custody of his mother and with robust conditions, including that he has no access to computers or other Internet-connected electronic devices. *See* Order, ECF No. 9. Three days later, Chief Judge Boasberg reversed the decision after the government presented evidence of additional online conversations Mr. Holley had with perceived minors. *See* Minute Order (Sep. 18, 2025).

After the case was assigned to this Court, Mr. Holley filed a Motion to Reinstate, seeking to be released into the custody of his mother with the same conditions imposed by Magistrate Judge Sharbaugh. *See* Mot. to Reinstate, ECF No. 18. After a hearing on October 28, 2025, the Court denied Mr. Holley's motion. *See generally United States v. Holley,* Crim. No. 25-252, 2025 WL 3507180 (D.D.C. Dec. 3, 2025). The Court concluded that the nature and circumstances of the offense, the weight of evidence, and Mr. Holley's history and characteristics weighed in favor of detention; and that the nature and seriousness of

the danger that his release would pose could not be mitigated by the concededly robust conditions imposed by Magistrate Judge Sharbaugh because Mr. Holley's parents could not monitor him twenty-four hours a day, seven days a week. *See generally id.* Mr. Holley is incarcerated at Northern Neck Regional Jail ("Northern Neck").

Mr. Holley filed the pending Motion for Bond Review on February 5, 2026. *See* Mot., ECF No. 33. The government filed its opposition on February 13, 2026. *See* Opp'n, ECF No. 34. The Court held a status hearing on February 24, 2026, after which it ordered Mr. Holley to submit an evaluation of his mental health status to the Court, including steps taken to address recent mental health crises during his pretrial confinement in this case, and to provide information about current efforts to provide him with appropriate mental health care. *See* Order, ECF No. 37. On April 21, 2026, Mr. Holley submitted a Supplement to his Motion for Bond Review with an attached Pre-Trial Psychosexual Risk Assessment ("Risk Assessment"). *See* Suppl., ECF No. 38; Risk Assessment, ECF No. 38-1. The government filed its reply on April 28, 2026. *See* Gov't's Reply, ECF No. 39. Mr. Holley filed his reply to the government's reply to his supplement on May 5, 2026. *See* Def.'s Reply, ECF No. 40.

**B.    Pre-Trial Psychosexual Risk Assessment**

The Risk Assessment of Mr. Holley was prepared by Dr. Hildembrand Forensic Psychology Consulting on April 6, 2026. Risk Assessment, ECF No. 38-1 at 1. The purpose of the Risk Assessment is "to estimate the likelihood of future sexual or violent offending based on empirically derived risk factors. These tools compare an individual's score to groups of similar offenders to determine the proportion who have reoffended over time." *Id.* at 20.

The Risk Assessment was based on the following information and tests: (1) review of materials related to the criminal charges against Mr. Holley; (2) review of mental health records from Northern Neck and educational/developmental documentation from the Kennedy Krieger Institute; (3) four interviews of Mr. Holley totaling four hours; (4) an interview of Mr. Holley's parents; (5) a battery of psychological and psychosexual testing designed to evaluate Mr. Holley's personality structure, emotional functioning, impulse control, and areas of potential sexual deviance; (6) "[a]n actuarial risk assessment instrument (Static-99R) and a structured professional judgment framework informed by the SVR-20 . . . to estimate Mr. Holley's risk for sexual recidivism"; and (7) ongoing clinical consultation with Mr. Holley's treating sex-offender-specific therapist, Dr.

4

Hildembrand, to obtain additional information regarding treatment engagement, progress, and risk management. *Id*. at 1-3.

Mr. Holley has been receiving "sex-offender—specific treatment" from Dr. Hildembrand since December 17, 2025, by attending weekly virtual sessions. Mot., ECF No. 33 at 2. The Risk Assessment states that Mr. Holley is consistently engaged in his treatment, is willing to examine his own behavior, and is committed to changing his behavior. Risk Assessment, ECF No. 38-1 at 15. With regard to the progress of his treatment and his current functioning, the Risk Assessment states as follows:

> Overall, Mr. Holley is making early but meaningful progress in areas directly related to risk, including emotional regulation, coping, sexual self-control, and accountability. Continued treatment will be important to build on these gains and support their application in a less structured environment. These gains would likely be further supported in a structured, community-based setting, where he can continue to practice and reinforce these skills.

*Id*. at 16.

The Risk Assessment's findings, conclusions, and estimates most relevant to Mr. Holley's danger to the community are described below.

Findings from the Sexual Adjustment Inventory ("SAI") include that Mr. Holley has "significant difficulty with sexual self-regulation, including elevated sexual preoccupation and

dissatisfaction." *Id*. at 18. This test found "no evidence of sexual interest in children" and his score for sexual assault was in the "moderate range." *Id*. The Risk Assessment concludes that "the findings suggest that his sexual behavior is best understood within a broader pattern of sexual dysregulation, poor coping, and impulse control difficulties, rather than a fixed deviant sexual interest pattern." *Id*. at 19.

The Actuarial Risk Assessment ("ARA") estimates relative sexual recidivism risk based on several factors. *Id*. at 20. The conclusion from this assessment is that "if [Mr. Holley] maintains abstinence from pornography and substances and continues in structured treatment," he is most comparable with persons who have been found to sexually recidivate at a rate of approximately 4.6% to 9.6% over five years. *Id*. at 21.

The Structured Professional Judgment Framework noted that although the charged "offense and related online behavior support the presence of deviant sexual ideation involving minors, the available data do not support a stable or preferential sexual interest in children." *Id*. at 21. Overall, the framework "supports the conclusion that Mr. Holley's risk is best understood as context-dependent, dynamic, and manageable with appropriate treatment and supervision, rather than indicative of a fixed or enduring pattern of sexual dangerousness." *Id*.

The Dynamic Risk Factor Assessment ("DRFA") looks at risk factors that may be most relevant to re-offending. *Id.* at 22. This assessment indicates that the following risk factors are present with Mr. Holley: (1) sexual preoccupation based on his difficulty with sexual self-regulation; (2) deviant sexual interest (such as a preference for children) is "present, but embedded within a broader pattern of compulsive and dysregulated sexual behavior rather than a primary or exclusive deviant orientation"; (3) lack of emotionally intimate relationships with adults; (4) lifestyle impulsivity; (5) poor problem solving; and (6) negative social influences. *Id.* at 22-26. This assessment indicates that the following risk factors are not present: (1) emotional congruence with children; (2) resistance to rules and supervision; and (3) hostility/grievance. *Id.*

The Risk Assessment states that despite the evidence in the criminal case,

> the available evidence does not support a diagnosis of Pedophilic Disorder (F65.4), as there is insufficient evidence of a fixed, sustained, and preferential sexual interest in prepubescent children. Objective testing did not identify a stable pedophilic arousal pattern, and his broader history is more consistent with sexual dysregulation, compulsive sexual behavior, and use of sexual activity as a coping mechanism, rather than a primary attraction to children.

*Id.* at 26. However, the data does support a diagnosis of

Paraphilic Disorder—Non-consenting Persons based on his "recurrent deviant sexual behavior involving non-consenting others over time." *Id.*

The Risk Assessment concludes that "[o]verall, Mr. Holley presents as an individual whose risk is situational and modifiable rather than fixed or predatory in nature. With continued treatment, structured support, and ongoing monitoring, his risk is expected to remain manageable over time." *Id.* at 29.

The Risk Assessment contains the following treatment and risk management recommendations: (1) individual and group sex-offender-specific treatment; (2) a psychiatric evaluation and medication management upon his release; (3) substance use treatment and monitoring in view of his history of abuse of alcohol and cannabis; (4) sexual behavior focused support such as Sex Addicts Anonymous; (5) family counseling and psychoeducation; (6) behavioral monitoring such as sexual history polygraph testing and substance abuse testing; (7) supervision and environmental controls including no unsupervised contact with minors, and restrictions and monitoring related to Internet use and online activity; and (8) ongoing clinical monitoring. *Id.* at 30-32.

## II.  Legal Standard

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The

"provisions for pretrial detention in the Bail Reform Act of 1984 fall within that carefully limited exception." *Id.* The Act provides that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). The danger a person poses to the community is a sufficient reason to order pretrial detention. *Salerno,* 481 U.S. at 754-55; *United States v. Simpkins*, 826 F.2d 94, 98 (D.C. Cir. 1987).

The government bears the burden of showing that no condition or combination of conditions can mitigate danger to the community based on clear and convincing evidence. *See United States v. Munchel*, 991 F.3d 1273, 1279-80 (D.C. Cir. 2021); 18 U.S.C. § 3412(f) (articulating clear and convincing evidence standard for dangerousness determination). "[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person . . . and the safety of . . . the community", *see* 18 U.S.C. § 3142(g); courts consider four factors: "(1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the

community that would be posed by the person's release." *Munchel*, 991 F.3d at 1279 (internal quotations omitted). The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") explains that "a defendant's detention based on dangerousness accords with due process only insofar as [his] history, characteristics, and alleged criminal conduct make clear that he ... poses a concrete, prospective threat to public safety." *Id.* at 1280; *see id.* at 1282 (explaining that government must demonstrate defendant's "identified and articulable threat to the community").

"When there is probable cause to believe that the defendant committed an offense involving a minor victim under 18 U.S.C. § 2252(a)(2), as here, there is a rebuttable presumption that 'no condition or combination of conditions will reasonably assure ... the safety of the community.'" *United States v. Farina*, No. 25-cr-232, 2025 WL 2651249, *2 (D.D.C. Sept. 16, 2025) (quoting 18 U.S.C. § 3142(e)(3)(E)). "Once the rebuttable presumption is triggered, 'the defendant bears the burden of production to offer some credible evidence contrary to the statutory presumption.'" *Id.* (citing *United States v. Blanchard,* No. 18-MJ-101, 2018 WL 4964505, at *4 (D.D.C. Oct. 15, 2018) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)). "The defendant may carry this burden by coming forward with some evidence that he will not ... endanger the community if

released." *Id.* (quoting *United States v. Garner*, No. CR 24-533, 2025 WL 1575848, at *3 (D.D.C. Mar. 11, 2025) (citation omitted)). "If the defendant rebuts the presumption 'the presumption is not erased but rather remains in the case as an evidentiary finding militating against release to be weighed along with other evidence.'" *Id.* (internal citation omitted).

## III. Analysis

There has been no change to: (1) the nature and circumstances of the offense with which Mr. Holley is charged, (2) the weight of the evidence against him, or (3) his history and characteristics; and so the Court incorporates its prior conclusions here. *See generally Holley*, 2025 WL 3507180. Rather, Mr. Holley focuses on the nature and seriousness of the danger to any person or the community that would be posed by his release.

Specifically, Mr. Holley argues that he should be released pending trial for two reasons. First, Dr. Hildembrand informed defense counsel that "Mr. Holley's rehabilitative efforts would be optimized if he were in the community, meeting in person with [her] and his peers as part of group therapy." Mot., ECF No. 33 at 2-3. Mr. Holley states that his treatment requires him to be "honest and open about his sexual sobriety, urges, and thoughts around treatment," but that "it is life-threatening to be open about [these issues] while incarcerated." *See id.* at 3. Second,

11

Mr. Holley states that he attempted suicide twice since being incarcerated. *Id.* at 3.

Following the completion of the Risk Assessment, Mr. Holley argues in his supplemental filing that granting him pre-trial release to receive "outpatient treatment would not only eliminate one of the two major stressors contributing to [his] mental health crisis, i.e., incarceration and pending legal sanctions, but also would provide the most effective means to manage any risk that [he] poses to reoffend." Suppl., ECF No. 38 at 3 (quoting Risk Assessment, ECF No. 38-1 at 32).

### A. Treatment and Risk Management

The treatment and risk management section of the Risk Assessment indicates that Mr. Holley needs to employ a variety of strategies to address what led to the actions that form the factual basis of the charges against him and to reduce the risk that he will engage in them again. *See* Risk Assessment, ECF No. 38-1 at 30-32. The Risk Assessment states that "outpatient treatment . . . would provide the most effective means to manage any risk that Mr. Holley poses to reoffend." *Id.* at 32. The Court acknowledges Mr. Holley's position that outpatient treatment would be more effective than the virtual treatment he is receiving while detained. Suppl., ECF No. 38 at 3. The Court also acknowledges that Mr. Holley's detention results in him not being able to participate in group therapy or participate in

activities such as Sex Addicts Anonymous. *Id.* at 3-4. The Court is also mindful that Mr. Holley is unable to be "honest and open" about his issues while incarcerated. For the reasons explained below, however, the Risk Assessment does not rebut the presumption of dangerousness.

First, the Risk Assessment emphasizes that Mr. Holley is in the early stages of making progress to address his various issues. *Id.* at 16. The Court commends Mr. Holley for his progress so far, but the fact is that when the Risk Assessment was issued, he had been receiving therapy for a little over three months, as compared with many years of engaging in the sexual behaviors and substance abuse described in the Risk Assessment. Mr. Holley emphasizes that "while the Report does not suggest that treatment in custody does not work, it *does* highlight that further meaningful progress depends on a setting where those skills can actually be practiced and monitored." Def.'s Reply, ECF No. 40 at 4. The Court acknowledges this distinction; however, the question before the Court is whether the presumption of dangerousness has been rebutted. Despite the progress Mr. Holley made between December 2025 and April 2026, and treatment planned for him should he be released, he cannot be monitored twenty-four hours a day, seven days a week. The Court notes that the Risk Assessment indicates that "monitoring" him is a critical piece of his treatment.

Second, the findings from the SAI indicate that Mr. Holley has "significant difficulty with sexual self-regulation, including elevated sexual preoccupation and dissatisfaction." Risk Assessment, ECF No. 38-1 at 18. The Court noted in its December 2025 Memorandum Opinion that is it not possible for Mr. Holley to be monitored continuously. *See Holley,* 2025 WL 3507180, at *8. Accordingly, if Mr. Holley were released, he could obtain the means to access the Internet, could obtain pornography, and could obtain alcohol and cannabis; all of which, according to the Risk Assessment, influence his inability to sexually self-regulate. *See generally* Risk Assessment, ECF No. 38-1. Similarly, the ARA, which estimates his chances of sexually recidivating at 4.6% to 9.6% over five years, is contingent upon his abstinence from pornography and substances. *Id.* at 20–21. As noted above, the Court cannot be assured of his abstinence from pornography and substances since he cannot be monitored twenty-four hours a day, seven days a week.

Third, although the Risk Assessment concludes that there is insufficient evidence of a fixed, sustained, and preferential sexual interest in prepubescent children, *id.* at 26; the record in this case demonstrates otherwise. Mr. Holley emphasizes that "Dr. Hildembrand concludes that Mr. Holley's behavior is much more consistent with sexual compulsivity, disinhibition, and impaired judgment, rather than a fixed arousal preference. That

14

distinction matters because it directly informs how risk is understood and throughout the Report Mr. Holley's risk is framed as dynamic and responsive to treatment." Def.'s Reply, ECF No. 40 at 3. The Court concludes, however, that even if Mr. Holley's risk is "dynamic and responsive to treatment," this does not provide evidence to rebut the presumption of dangerousness because Mr. Holley cannot be monitored twenty-four hours a day, seven days a week. Furthermore, the record in this case demonstrates that Mr. Holley does have an interest in engaging in sexual activity with children, specifically, there is evidence of multiple online conversations about engaging in sexual activity with children culminating in travel to the District of Columbia to engage in sexual activity with a child.

Fourth, the DRFA, which the Risk Assessment states are risk factors that may be most relevant to re-offending, *id.* at 22; indicates that six of the nine risk factors are present with Mr. Holley. Specifically, the Risk Assessment identifies the following risk factors as being present: (1) sexual preoccupation based on his difficulty with sexual self-regulation; (2) deviant sexual interest (such as a preference for children) is "present, but embedded within a broader pattern of compulsive and dysregulated sexual behavior rather than a primary or exclusive deviant orientation;" (3) lack of emotionally intimate relationships with adults; (4) lifestyle

15

impulsivity; (5) poor problem solving; and (6) negative social influences. *Id.* at 22-26. Mr. Holley concedes that while the Risk Assessment

> acknowledges meaningful risk factors, it consistently frames Mr. Holley's risk as something that is modifiable and manageable with the right structure and oversight. In plain terms, despite Mr. Holley's risk factors, Dr. Hildembrand believes that he remains a good candidate for community-based treatment because he has shown a positive response so far, with real progress in urge control, self-monitoring, accountability, and an understanding of victim impact.

Def.'s Reply, ECF No. 40. Again, the Court commends Mr. Holley for the progress he has made in the four months leading up to the issuance of the Risk Assessment. However, and as he concedes, the Risk Assessment "acknowledges meaningful risk factors." Def.'s Reply, ECF No. 40 at 4. Although the Risk Assessment maintains that these factors can be managed with structure and oversight, because Mr. Holley cannot be monitored twenty-four hours a day, seven days a week, the Risk Assessment does not provide evidence to rebut the presumption of dangerousness.

### B. Mental Health Issues

The Risk Assessment states that Mr. Holley is "not actively suicidal though he continue[s] to endorse passive suicidal ideation (no plan)." Risk Assessment, ECF No. 38-1 at 12. That said, "[h]is current risk level remains high due to his recent attempt and ongoing stressors of being incarcerated and pending legal sanctions." *Id*.

The Court is mindful that releasing Mr. Holley could eliminate the mental health stress that is contributing to his suicide risk level. However, Mr. Holley can continue weekly therapy sessions with Dr. Hildembrand virtually. The record here demonstrates that these sessions have a positive influence on him. *Id*. at 4 (noting that Northern Neck mental health documentation states that Mr. Holley met with Dr. Hildembrand on December 26, 2025, and afterwards "report[ed] he discussed with his therapist today how he ended up on suicide watch and feels positive after talking about his concerns that lead to suicide watch").

Furthermore, the information provided by defense counsel demonstrates that Northern Neck has been responsive to his mental health needs. Specifically, he has been placed on the "mental health acute list for monitoring of his mental health needs." Suppl., ECF No. 38 at 3. He met with a mental health provider three times in December 2025, and as a result of the

17

last meeting in December, he was placed on suicide watch. *Id.* Three days after being placed on suicide watch, he reported no suicidal ideation. *Id.* Northern Neck secured a telemedicine psychiatric consultation for Mr. Holley on December 29, 2025, resulting in him being prescribed an antidepressant, although it is unclear the extent to which he has been able to take the medication. *Id.* at 4.

Accordingly, the Court concludes that Mr. Holley's mental health needs are being addressed at Northern Neck and through virtual therapy with Dr. Hildembrand.

## IV.  Conclusion

The Court commends Mr. Holley for his engagement with his treatment and sincerely hopes this continues; however, for all the reasons discussed above, the Risk Assessment does not provide evidence that rebuts the presumption that he is a danger to the community. The government has therefore shown by clear and convincing evidence that no conditions can reasonably assure the safety of the community. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**June 5, 2026**

18